```
                         19MAG 7641
Approved:   _____      ORIGINAL
            THANE REHN & EMILY JOHNSON
            Assistant United States Attorneys

Before:     THE HONORABLE HENRY B. PITMAN
            United States Magistrate Judge
            Southern District of New York
```

- - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED COMPLAINT** |
| - v. - | Violations of 18 U.S.C. §§ 1349, 1028A, and 2 |
| SHERMAN JULES, a/k/a "Spliffy," | COUNTY OF OFFENSE: NEW YORK |
| Defendant. | |

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

  ANDREW MURPHY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

(Conspiracy to Commit Wire Fraud and Bank Fraud)

  1. From at least in or about March 2017, up to and including at least in or about February 2018, in the Southern District of New York and elsewhere, SHERMAN JULES, a/k/a "Spliffy," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

  2. It was a part and object of the conspiracy that SHERMAN JULES, a/k/a "Spliffy," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3. It was a further part and object of the conspiracy that SHERMAN JULES, a/k/a "Spliffy," the defendant, and others known and unknown, willfully and knowingly, would and did execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349)

## COUNT TWO

(Aggravated Identity Theft)

4. From at least in or about January 2018 up to and including at least in or about February 2018, in the Southern District of New York and elsewhere, SHERMAN JULES, a/k/a "Spliffy," the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, JULES used and transferred the names and addresses, and dates of birth of other people during and in relation to the offense charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1),
1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. I have worked on this investigation with other FBI Special Agents. This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement personnel, and my review of bank records and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the

course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. During the course of this investigation, I and other FBI agents have been working with a cooperating witness, "CW-1." CW-1 has entered a plea of guilty to two counts of conspiracy to commit wire fraud and bank fraud, one count of conspiracy to commit money laundering, and one count of aggravated identity theft, and is cooperating with law enforcement in the hopes of obtaining leniency at sentencing. Information provided by CW-1 has proven reliable and has been corroborated by, among other things, law enforcement surveillance, bank records, text messages, and recordings of conversations.

7. Based on my conversations with CW-1, my review of law enforcement reports, and my conversations with other law enforcement agents who have had conversations with CW-1, I have learned, among other things, the following:

    a. In or around March 2017, CW-1 met an individual named ARTUR CHITYAN in Los Angeles, California.

    b. In or around May 2017, CHITYAN began directing CW-1 to carry out a method for obtaining funds from other people's bank accounts (the "Scheme"). Specifically, CHITYAN or individuals sent by CHITYAN would provide CW-1 with a counterfeit identification card, such as a driver's license, that had CW-1's picture but another person's name and address. CW-1 would then enter a bank branch and use the other person's identification card to obtain a temporary debit card for that person's bank account, which CW-1 would use to make cash withdrawals at bank branches.

    c. CW-1 perpetrated the Scheme on multiple occasions beginning in or around May 2017. One of the other people sent by CHITYAN to provide CW-1 with an identification document and drive CW-1 to bank branches was an individual named DALE ANTHONY DAVIDSON.[1]

8. In the course of this investigation, I have reviewed portions of the contents of a cellphone seized from DAVIDSON (the "DAVIDSON Cellphone") at the time of his arrest in May 2018 and searched with his consent, as well as emails obtained from a search

---

[1] CHITYAN and DAVIDSON have both pled guilty in the Southern District of New York to conspiracy to commit bank fraud and wire fraud, and are awaiting sentencing.

warrant for a particular email account known to be used by DAVIDSON (the "DAVIDSON Email Account"), and New York State Department of Motor Vehicle ("DMV") records, and have learned that SHERMAN JULES, a/k/a "Spliffy," the defendant, has sent bank account information to DAVIDSON. Specifically, I have learned, among other things, the following:

      a. On or about October 24, 2017, the DAVIDSON Cellphone received several text messages from a cellphone (the "JULES Cellphone") that stated, in part, "this spliffy," and instructed DAVIDSON to send money to another individual.

      b. On or about November 17, 2017, the DAVIDSON Cellphone received a text message from the JULES Cellphone that contained a link to a YouTube rap music video featuring "Spliffy Da Don." I have reviewed this music video and seen that it contains a reference to an Instagram profile for "Spliffy Da Don." I have compared both (a) an individual featured in the music video and (b) an individual featured in photographs on the "Spliffy Da Don" Instagram account with a known photograph of JULES taken from a database available to law enforcement. Based on that review, I believe that "Spliffy Da Don," who appears to be the user of the JULES Cellphone, is JULES.

      c. On or about January 11, 2018, the DAVIDSON Cellphone and the JULES Cellphone exchanged text messages in which they discussed "works," and the DAVIDSON Cellphone sent the JULES Cellphone a message stating "And yeah let's get some money, whatever you wanna do I'm down." On or about January 17, 2018, the DAVIDSON Cellphone received a text message from the JULES Cellphone that stated, in sum and substance, that DAVIDSON should contact JULES because JULES had something.

      d. On or about January 18, 2018, between approximately 1:28 p.m. and 1:30 p.m. Eastern time, the DAVIDSON Email Account received four emails from another email account. Two of the emails contained what appears to be the names, dates of birth, Social Security numbers, and addresses of two other persons ("Victim-1" and "Victim-2"). The other two emails each contained an image of what appears to be a portion of a bank document with the signatures of Victim-1 and Victim-2, respectively.

      e. On or about January 18, 2018, at approximately 3:05 p.m. Eastern time, the DAVIDSON Cellphone received a text message from the JULES Cellphone that stated "I sent it." Based on the timing of this message in relation to the emails described supra ¶ 8(d), it appears to me that the user of the JULES Cellphone was referring to having sent those emails containing personal

4

identifying information and bank account information for Victim-1 and Victim-2.

      f. On or about January 19, 2018, the DAVIDSON Cellphone sent a text message to the JULES Cellphone that stated "Send add." In response, the JULES Cellphone sent the DAVIDSON Cellphone a text message with an address for a residence in Brooklyn, New York. I have reviewed New York DMV records and have learned that that address is listed as the street address for JULES.

      9. On or about January 11, 2018, CW-1 was arrested in Brooklyn, New York. Following CW-1's arrest, CW-1 began cooperating with law enforcement in the hopes of obtaining leniency. In the course of my involvement with CW-1's cooperation, I have had multiple conversations with CW-1 and with other law enforcement officers who have had conversations with CW-1, have reviewed reports prepared by law enforcement officers, have worked with other law enforcement officers to conduct surveillance of undercover activities conducted by CW-1, and have reviewed portions of audio recordings made by CW-1 in an undercover capacity at the direction of law enforcement. I have learned, among other things, the following:

      a. On or about January 23, 2018, DAVIDSON had a recorded call with CW-1 in which DAVIDSON said, in relevant part, "I'm about to send you the thing. I'm a send you the stuff. Tomorrow he'll come pick you up at nine in the morning." When asked by CW-1 to explain, DAVIDSON responded, "To – to – member I was telling you I was gonna send some stuff to you?" Later in the call, DAVIDSON continued, "I bought – I paid for the stuff and I sent it to them." At the conclusion of the call CW-1 agreed to the meeting, which ultimately did not occur the following day, and DAVIDSON advised he would send something to CW-1 right away.

      b. On or about January 23, 2018, the DAVIDSON Email Account sent CW-1 an email which contained what appears to be the date of birth, social security number, address and driver's license number of Victim-1, which was the same information that had been emailed to the DAVIDSON Email Account by JULES on or about January 18, 2018. See supra ¶¶ 8(d), 8(e).

      c. On or about January 28, 2018, DAVIDSON had a recorded call with CW-1, in which DAVIDSON and CW-1 discussed "work." DAVIDSON advised CW-1, in substance, that DAVIDSON would arrange for someone to pick up CW-1 the following day at a location in Brooklyn, New York, to be provided by CW-1.

5

    d. On or about January 29, 2018, CW-1 waited at the location arranged by DAVIDSON, and was subsequently picked up by a man ("CC-1") driving a white GMC Yukon with a Pennsylvania license plate (the "SUV"). CW-1 was also picked up by CC-1 in the SUV on or about January 30, 2018.

    e. At the direction of law enforcement, CW-1 wore an audio recording device during these meetings with CC-1 and CW-1's subsequent meeting with CC-1, and I and other law enforcement agents conducted visual surveillance of portions of the meetings between CW-1 and CC-1.

    f. I have listened to portions of audio recordings made by CW-1 of his meetings with CC-1, and have learned that CC-1 and CW-1 had multiple speakerphone calls from the SUV with DAVIDSON and with another man, in which the participants discussed, in sum and substance, the use of false identification documents to commit fraudulent transactions. In one of these audio recordings, I have heard DAVIDSON refer to the other man who was having calls with CC-1 and CW-1 as "Spliffy," which I believe to be SHERMAN JULES, a/k/a "Spliffy," the defendant.

  10. During the course of this investigation, I and other FBI agents have been working with another cooperating witness, "CW-2." CW-2 has entered a plea of guilty to conspiracy to commit wire fraud and bank fraud and aggravated identity theft, and is cooperating with law enforcement in the hopes of obtaining leniency at sentencing. Information provided by CW-2 has proven reliable and has been corroborated by, among other things, bank records, photographs, and text messages. Based on my conversations with CW-2, I have learned, among other things, the following:

    a. SHERMAN JULES, a/k/a "Spliffy," the defendant, is an associate of DAVIDSON, who CW-2 also knows personally and refers to as "Spliffy."

    b. CW-2 has identified a known photograph of JULES, taken from social media, as "Spliffy."

    c. CW-2 has listened to a portion of the audio recordings made by CW-1 of telephone calls with "Spliffy." See supra ¶ 9(f). CW-2 has identified the voice of "Spliffy" as the voice of JULES.

  11. I have reviewed portions of the audio recording made by CW-1 of CW-1's meeting with CC-1 on or about January 29, 2018, and have also spoken with CW-1 about this meeting and the Scheme and

reviewed reports prepared by law enforcement officers. From this information, I have learned, among other things, the following:

      a. At the meeting on or about January 29, 2018, CC-1 provided CW-1 with a forged Illinois driver's license containing CW-1's photograph and the name and date of birth of Victim-1, as well as with a forged social security card containing the name and social security number of Victim-1.

      b. Shortly after picking up CW-1 on January 29, 2018, CC-1 and CW-1 had a speakerphone call from the SUV with SHERMAN JULES, a/k/a "Spliffy," the defendant. On this call, and on a subsequent call on the same day, JULES explained, in sum and substance, that CW-1 would need to go into a store for a cellphone company ("Cellphone Company-1"), claim to be Victim-1, and purchase a cellphone that would be put in Victim-1's name and given the number for Victim-1's cellphone. CW-1 understood that CW-1 would then use this cellphone to obtain information about Victim-1's bank account at a branch of a bank whose deposits are insured by the Federal Deposit Insurance Corporation ("Bank-1"), which could be used to perpetrate fraudulent transactions.

      c. For instance, on the first recorded call with JULES on or about January 29, 2018, CC-1 asked "Where am I going?" JULES responded "Um, to – to [Bank-1]. I'm a send you – I'm a send you the – the – the cheddar – uh, the number. Well, first you gotta go to the [Cellphone Company-1]."

      d. CC-1 then drove CW-1 to a Cellphone Company-1 store, where CW-1 entered the store, claimed to be Victim-1, and purchased a cellphone that was assigned to Victim-1 and given the phone number for Victim-1's cellphone.

      e. After CW-1 obtained a cellphone with Victim-1's cellphone number, CC-1 drove CW-1 to a Bank-1 branch located in Brooklyn, New York, in order for CW-1 to enter the branch and obtain a temporary debit card for Victim-1's account. Before CW-1 entered the branch, CC-1 and CW-1 had a recorded speakerphone call with JULES in which CC-1 stated, in relevant part, "You ain't give him the last three transactions." JULES responded "Let me send them to you right now." Based on my training and experience, and my discussions with CW-1, I understand that members of this conspiracy would use the last three bank transactions to answer questions from bank employees about the account.

      f. CW-1 entered the branch. A law enforcement agent also covertly entered the bank branch at this time. Rather than obtaining a temporary debit card, CW-1 met with the law enforcement

agent and handed the forged driver's license and social security card to the law enforcement agent. CW-1 then returned to the SUV and told CC-1, in sum and substance, that a bank employee had taken the identification document.

12. On or about January 30, 2018, CW-1 met again with CC-1. I have reviewed portions of the audio recording made by CW-1 of this meeting, and have also spoken with CW-1 about this meeting and the Scheme and reviewed reports prepared by law enforcement officers. From this information, I have learned, among other things, the following:

    a. On or about January 29, 2018, the DAVIDSON Email Account sent CW-1 an email which contained what appears to be the date of birth, social security number, address and driver's license number of Victim-2, which was the same information that had been emailed to the DAVIDSON Email Account by SHERMAN JULES, a/k/a "Spliffy," the defendant, on January 18, 2018. See supra ¶¶ 8(d), 8(e).

    b. On or about January 30, 2018, CW-1 again met with CC-1, who provided CW-1 with a forged identity document containing a photograph of CW-1 and the personal information for Victim-2. CC-1 drove CW-1 to a Bank-1 branch in Brooklyn, New York, where CW-1 obtained a temporary debit card for Victim-2's account. CC-1 then took CW-1 to another Bank-1 branch, where CW-1 withdrew $7,500 from Victim-2's account. CW-1 called DAVIDSON, who instructed CW-1 to keep $1,400 and give the rest of the money to CC-1. CW-1 subsequently gave the $1,400 to law enforcement agents.

13. On or about February 2, 2018, CW-1 met again with CC-1. I have reviewed portions of the audio recording made by CW-1 of this meeting, and have also spoken with CW-1 about this meeting and the Scheme and reviewed a report prepared by law enforcement officers. From this information, I have learned, among other things, the following:

    a. On or about January 30, 2018, DAVIDSON sent CW-1 an email which contained what appears to be the date of birth, social security number, address, home telephone number and occupation of another person ("Victim-3").

    b. On or about February 2, 2018, CW-1 again met with CC-1, who provided CW-1 with a forged identification document containing CW-1's photograph and the name and date of birth of Victim-3, as well as a forged credit card with the name of Victim-3. CC-1 drove CW-1 to a Bank-1 branch in Lawrence, New York, where

CW-1 unsuccessfully attempted to get a bank statement for Victim-3's bank account.

       c. CC-1 and CW-1 then had a recorded speakerphone call with SHERMAN JULES, a/k/a "Spliffy," the defendant. On this call, CC-1 and JULES discussed, in sum and substance, using Victim-3's personally identifying information to obtain merchandise from a store for a cellphone company ("Cellphone Company-2"), where CW-1 could obtain merchandise on Victim-3's Cellphone Company-2 account without making any payments, and where JULES knew of an employee who would facilitate the fraudulent transaction.

       d. Specifically, on this call, JULES stated "My man got – got his man working at [Cellphone Company-2]." CC-1 replied "Alright, so [Cellphone Company-2] you don't need no money, right?" JULES responded "Yeah, [Cellphone Company-2] you don't need money. It's on 21st Street."

       e. CC-1 then drove CW-1 to a cellphone store (the "Cellphone Store") for Cellphone Company-2, which was located in the vicinity of 21st Street in Manhattan, New York. When they arrived at the Cellphone Store, CC-1 and CW-1 had a call with JULES, who asked what CW-1 was wearing, and also provided a physical description of an individual. JULES described the individual as "short" with "dark skin." CC-1 subsequently instructed CW-1 to go into the Cellphone Store and stand in a particular location.

       f. CW-1 entered the Cellphone Store and spoke with a particular employee, who CW-1 described as a black male who was shorter in height than CW-1. CW-1 then used Victim-3's identity and identification document to set up an account with the Cellphone Company. CW-1 then used the Victim-3 account to purchase three iPhones and three pairs of Beats headphones.

       g. CC-1 then drove CW-1 to another location in Manhattan, New York, where CC-1 sold the merchandise for approximately $2,190, and then paid approximately $620 to another individual as compensation for facilitating the acquisition of merchandise at the Cellphone Store. From the remaining $1,570, CC-1 retained approximately $730.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SHERMAN JULES, a/k/a "Spliffy," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
Special Agent Andrew Murphy
Federal Bureau of Investigation

Sworn to before me this
15th day of August, 2019

_____
THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK